## THOMAS T. ECKERT

### v.

## JAMES H. PETERS et al.

G., owning a tract of upland and also a separate tract fronting on the sea, conveyed to S. and his heirs, by warranty deed, the tract of upland, and, after describing it by metes and bounds, continued as follows: "Together with the free use and full right of sufficient land on my sea front for bathing purposes, with the right to enter thereon, erect bath-houses and use the same free of charge, undisturbed at any time."—*Held*, that by this deed G. gave to S. an easement of way over his land to the sea, and also that the right given to erect bath-houses and use the same free of charge, undisturbed at any time, was a license merely which was revoked both by the death of the parties and by a subsequent conveyance.

On bill &c.

This is a suit to quiet title. The material facts are these: In the year 1868, Charles H. Green was the owner of two tracts of land in that part of Long Branch known as West End. One of these tracts was a fifteen-acre tract of upland lying on the *westerly* side of Ocean avenue, and the other a sea-front tract about half as large, lying on the *easterly* side of Ocean avenue, between that avenue and the sea. This latter tract lay to the south of and did not adjoin the former, there being a distance of at least five hundred feet between them. The upland tract had been farm land and was entirely unimproved; the sea-front tract, having a depth of six hundred feet between Ocean avenue and ordinary high-water mark, was, much of it, low and wet. The only structures upon it were three or four small bath-houses, a fish-house and a life-saving station.

This being the situation of the respective lots, on November 19th, 1868, Charles H. Green and wife conveyed the fifteen-acre tract to Mayer Sternberger and his heirs by warranty deed. After describing the land by metes and bounds, he continued as follows:

" With the free use and right of sufficient land on my sea front for bathing purposes, with the right to enter thereon, erect bath-houses and use the same free of charge, undisturbed at any time; * * * to have and to hold the fifteen acres of land and right to bathe, hereditaments and premises hereby granted, and every part and parcel thereof with the appurtenances unto the said party of the second part, his heirs and assigns " &c.

On May 21st, 1881, Mayer Sternberger conveyed an equal undivided half interest in the fifteen-acre tract (with an unimportant reservation) to Simon Sternberger, "together with one equal undivided half interest in the sea-front rights granted and conveyed in and by the deed last aforesaid." And very shortly afterwards Mayer and Simon plotted the property into eighteen building lots, many of which have since been sold and nearly all of which have been built upon. In some of the deeds conveying these lots there has been a conveyance of a

"right in common with other owners, tenants and occupiers of the fifteen-acre tract to the bathing rights and privileges mentioned, described and granted in and by "

the Green deed; in others, such rights and privileges are not mentioned.

Green, the grantor, died in 1871. In 1875 the guardian of Ella Green, his sole heir-at-law, conveyed a portion of the sea-front lot to one Howland. It is now owned by the defendant William Clark. In 1878, Ella conveyed another portion of it to the United States of America, and, in 1881, still another portion to Brokaw and Curtis.

After these conveyances there remained of the sea-front land only the Eckert lot, the subject of the present bill, and a lot forty feet wide extending from Ocean avenue to the sea, which, it is claimed by the complainant, has been specially subjected to the burden cast upon the sea-front lot generally by the Green

deed, and which, it is also claimed, is fully sufficient to sustain that burden.

Ella Green (now Mrs. Peters) in her answer, in which her husband and Mrs. Green, the widow of Charles H. Green, join, says that she

"has set apart and dedicated this forty-feet strip to and for the use of the said owners of said fifteen-acre tract, so that such owners and each of them should enjoy the free use of sufficient land on said sea front for bathing purposes, with the right to enter thereon and erect bath-houses."

She has not, otherwise than by this answer, herself attempted to designate the land in which these privileges should be exercised by the owners of the fifteen-acre lot. In 1881, however, she conveyed to Leon Mandell a lot lying on the west side of Ocean avenue, and, as appurtenant thereto, a right of way over the forty-foot strip, and a right to erect a bath-house, expressly declaring that he was to hold the easement and privilege as an appurtenance to the other lot in common with the party of the first part, and of such other grantee or grantees of her (the said Ella) as *she* "has heretofore or may hereafter grant a right of way and bathing privileges appurtenant to their lands now owned by them."

In 1892, Ella conveyed to Eckert the lot which forms the subject-matter of the present controversy. The deed contains full covenants of warranty and against encumbrances. Eckert now files his bill to quiet title against all the present owners of the fifteen-acre lot, including the devisees of Mayer and Simon Sternberger, both of whom are dead. His claim, like Ella's, is that the forty-foot strip is ample to satisfy all the requirements of the original deed to Mayer Sternberger. The Sternbergers, on the other hand, and one of their grantees, Martha Hurtzig, insist that the Eckert lot, or a part of it, is subject to their so-called easement of bathing and that this court should so declare. They admit that they have never, since the date of the original conveyance in 1868, attempted to erect any bath-house on it, but they insist that they have at different times since then crossed portions of the Eckert lot for the purpose of bathing.

*Mr. John S. Applegate,* for the complainant.

*Mr. William H. Vredenburgh,* for Mrs. Peters.

*Mr. Alfred Walling, Jr.,* for Mr. Sternberger.

*Mr. Mahlon Pitney,* for Mr. Hurtzig.

*Mr. J. Kearny Rice,* for the United States.

STEVENS, V. C.

From the foregoing statement of facts it appears that, in 1868, one Green, being seized in fee of two lots—one a fifteen-acre lot not touching the ocean, and the other a sea-front lot, somewhat smaller—conveyed to one Sternberger. In his deed of conveyance, Green, after describing the fifteen-acre lot by metes and bounds, continued as follows:

"Together with the free use and full right of sufficient land on my sea front for bathing purposes, with the right to enter thereon, erect bath-houses and use the same free of charge, undisturbed at any time, to have and to hold * * * unto the party of the second part, his heirs and assigns" &c.

The question to be determined is what kind of interest or estate in the ocean-front lot passed by this deed. By apt words, it first conveys to Mayer Sternberger, in fee-simple, the fifteen-acre tract, and then it purports to grant (1) the free use and full right of sufficient land on my sea front for bathing purposes, (2) the right to enter thereon, and (3) the right to erect bath-houses and use the same free of charge, undisturbed at any time.

What is meant by "the free use and full right of sufficient land on my sea-front lot for bathing purposes?" If it was intended to grant a right to bathe in the waters of the ocean, the grant was nugatory, for the grantor did not own the land below high-water mark. If it was intended merely to give a right of passage to the water over the beach, so far as it lay above high-water mark, then this grant seems to be comprehended within

the terms of the specific grant of the right to enter on the grantor's "sea front." Giving to these two grants their utmost legal effect, they are fully satisfied by the appropriation of the strip of land forty feet in width—described in the Mandel deed—to the purposes of a way for bathers from Ocean avenue to the sea. This way, ever since the year 1881, has been open and used without dissent on the part of anyone interested. Until this suit was commenced, no question was raised about its sufficiency or location. Then, for the first time, so far as the evidence shows, it was insisted by *some* of the grantees and devisees of Sternberger that they were entitled to a like way over the northerly side of the Eckert lot. I do not intend to assert that the grantees and devisees of Sternberger derive their title to this way under the Mandel deed, the language of which is not broad enough to include them. What I do assert is that a right to a way having been given by the deed from Green to Sternberger, its practical location was defined by Green's daughter after his death, and that she, with the acquiescence of all parties interested, gave the benefit of it not only to Sternberger and his grantees, but, as she had a right to do, to Mandel and to others as well. So far, the case is free from difficulty.

I now come to the right to "erect bath-houses and use the same free of charge, undisturbed at any time." Nothing can be more vague and uncertain than this language. The bath-houses are to be erected on the grantor's "sea front." Does this mean on any part of the grantor's land between Ocean avenue and the sea? If not, where is the line to be drawn, west of which there shall be no bath-houses? How many bath-houses and of what sizes may Sternberger and his heirs and assigns erect? There were no improvements on the fifteen-acre tract, and it was probably contemplated by both parties that Sternberger would do just what he afterwards did, viz., divide the property into lots. Was the number of bath-houses that might be erected to be equal to the number of lots into which the tract was to be divided by Sternberger and subdivided by Sternberger's grantees?

It is manifest that if the grant of this right attached not only

to the fifteen-acre tract as a whole, but to every—even the smallest—subdivision of it, and the right to erect a bath-house passed, as it is claimed it passed, as an easement appurtenant to each parcel, the grantor practically granted to Sternberger, his heirs and assigns, at their election, for all time, the entire sea-front lot, as well as the fifteen-acre lot. I cannot put this construction on the grant. I think it plain that what Green really gave, so far as the right to erect bath-houses is concerned, was not an easement, but a license. If so, then, by the well-settled rules of the common law, such license has been revoked, first, by the death of the licensor; second, by the death of the licensee, Sternberger, and third, so far as the Eckert lot is concerned, by the conveyance, by warranty deed, by Ella Green to Eckert.

The fact that an easement was given at the same time that this license was given does not alter the nature of the license. In *Thomas* v. *Sorrel, Vaugh. 351,* Chief-Justice Vaughan said : "A license to hunt in a man's park and carry away the deer killed to his own use, to cut down a tree in a man's ground and to carry it away the next day after, to his own use, are licenses as to the act of hunting and cutting down the tree, but as to the carrying away of the deer killed and the tree cut down, they are grants." In like manner, the right of entry on land, given to enable bathers to reach the sea, may well be an easement, enjoyable either by the owner or occupier of the whole or part of the original tract (*United Land Co.* v. *Great Eastern Railway Co., L. R. 17 Eq. Cas. 158; Newcomen* v. *Coulsen, 5 Ch. Div. 133*), while the right to erect bath-houses may be nothing more than a license.

That this is so will appear from the following considerations: No present estate in the land was granted. There was given merely a privilege in the future to put up an indefinite number of bath-houses upon an indefinite site for an indefinite period. Such a privilege falls exactly within the definition of a license, viz., " an authority to do a particular act or series of acts upon another's land without possessing any estate therein." *East Jersey Iron Co.* v. *Wright, 5 Stew. Eq. 253.* The following cases

seem to be in point: In *Webb* v. *Paternoster, Rolle 143, 152,* the right to stack hay on the close of Sir W. P. was granted; in *Wood* v. *Lake, Say. 3,* the liberty to stack coals on defendant's land for seven years. In each of these cases what was given was held to be a license. *Jackson* v. *Babcock, 4 Johns. 417,* is another illustration. There, C. G., the owner of the land, by writing under his seal, gave to J. H.

"the privilege, during his pleasure unmolested, to build a house near a pool, free from molestation, disturbance, injury or removal from or under me, for him, the said J. H., to inhabit and occupy peaceably during his necessity or pleasure."

Hitchcock built a house and took possession of it, but afterward conveyed his interest. During his life, ejectment was brought against the tenant in possession under J. H.'s grantee. It was held that the writing was a mere license or personal privilege to inhabit, and conveyed no title.

In *East Jersey Iron Co.* v. *Wright, 5 Stew. Eq. 248,* the agreement in writing under seal was to give to A. and his heirs and assigns the exclusive right to raise and remove ores from certain land of W. and to erect such works and buildings as were necessary in conducting their business. It was held by Vice-Chancellor Van Fleet that the agreement did not pass any estate or property in the land or minerals, but was merely a license. The reasoning in that case applies with much force to the present. He says: "What is the legal operation of the Rude agreement? Is it a grant, a lease or merely a license. The language, it will be observed, is purely promissory or executory: ' It is agreed that Rude and those who succeed to his rights shall have the exclusive right and privilege' &c. Nothing passes presently as under technical words of grant, *dedi et concessi.* To constitute a grant, it is not indispensable that technical words shall be used, but they must be words that will manifest the same intention. No such words are found here. The language of this instrument is equally inefficacious to manifest a purpose to make a demise.  *  *  *  They [the words] must clearly show that the lessor intends to divest himself of posses-

sion and that the lessee shall come into it. * * * Unless we attribute to them a significance much more extensive than they have in legal science or can have in virtue of their own intrinsic force, it is plain that they pass no estate or property in the lands or the minerals deposited in them. They, at most, merely gave Rude authority—we may say exclusive authority—to enter upon the lands of Williams and do a series of acts there for his own profit without passing any estate or property in the land. Such an authorization is a license and not a lease."

The above cases are illustrations of license. The right "to erect bath-houses and use the same free of charge, undisturbed at any time," is, in its essential features, strikingly like the authorizations there considered, and, on the other hand, it is strikingly unlike the various kinds of easements mentioned in the books. This unlikeness would of itself seem to condemn it, for it is laid down that new species of incorporeal hereditaments cannot be created at the will of the owners of estates. *Hill* v. *Tupper, 2 Hurlst. & C. 121; Keppel* v. *Bailey, 2 Myl. & K. 537.* So long as the grantee named in the deed, his heirs and assigns, refrain from erecting these bath-houses, the grantor is to continue in the absolute and unqualified possession of his property. His enjoyment of it is to be without limitation. When, on the other hand, the grantee sees fit to build, all visible dominion of the grantor over the property, so far as built upon, ceases. The possession and enjoyment are then to become exclusive in the grantee, and to remain so as long as the buildings stand and are used by him, his heirs or his or their assigns. What, in such a situation, is there to suggest an easement? In the words of Lord Campbell, in *Race* v. *Ward, 4 El. & B. 709,* a claim which leaves nothing for the owner of the soil is wholly inconsistent with the right of property in the soil. Furthermore, the possession and enjoyment carry with them the profits, but it is said to be one of the essential characteristics of an easement that it confers no right to a participation in profits. *Washb. Easem. 3.*

I am of opinion, therefore, that the authorization in question is not an easement, but a license.

If it had been the intention of Green to grant, and of Sternberger to acquire, a stable right to a portion of the sea-front lot, words appropriate to that end might have been found in the very deed we are considering. The definite conveyance of the fifteen acres of upland stands in strong contrast to the vague and indefinite grant of the right to erect bath-houses at the will of the grantee, at any time, upon some indefinite portion of the sea front. Nothing can be gained by permitting parties to complicate titles by the creation of novel rights in real estate having undefined but enduring incidents. Regarded as licenses merely, these creations often subserve a useful purpose. They always, until revoked, protect the licensees from responsibility as trespassers. They may sometimes, by reason of equities growing out of their execution, become irrevocable.

The fact that the instrument was under seal, and the fact that it, in terms, gave a license to Sternberger, *his heirs and assigns*, does not alter its nature. If, because it was in writing, it was not open to objection on the ground of the statute of frauds, it was still a license, and being such there was attached to it the necessary incident of being terminable both by the subsequent conveyance and by the death of the parties. *East Jersey Iron Co.* v. *Wright, 5 Stew. Eq. 253.*

The complainant is entitled to relief.